# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**JAMES S GREENE**

**CIVIL ACTION**

**V.**

**NO. _____**

**WALGREENS EASTERN CO, INC.**



# COMPLAINT

## PLAINTIFF

1.    Plaintiff is a 68 year old African American male and a citizen of the United States.

Plaintiff's address and phone number are:   P.O. Box 603, Norwood, MA. 02062,

781-255-9253.

## DEFENDANT

2.      Defendant's address and phone number are: Walgreen's Eastern Co., Inc., 210 Bear

Hill Road, Waltham, MA 02451, 781-890-0588.

## STATUTORY  STATEMENT

3.      I am bringing this action against Walgreens because my rights have

been violated under the Age Discrimination in Employment Act of 1967, as

amended, and Title VII of the Civil Rights Act of 1964, as amended.

## JURISDICTIONAL STATEMENT

Jurisdiction is specifically conferred upon this United States District Court by the

aforementioned statutes, as well as 28 U.S.C. §§ 1331, 1343.  Jurisdiction may also

be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended.

## PRELIMINARY STATEMENT

4.      **Overview**. I am filing this complaint because Walgreens has unlawfully discriminated

against me on the basis of my age and/or race as regards job promotions and other job

opportunities.

I worked at various Walgreens store locations in the area south of Boston (Walgreens Boston

South District 106 ) from August 12, 2005,until July 8, 2014 in the job title of Management

Trainee (MGT). This job grade was considered a management job. I applied for promotion at least three times between 2005 and 2014 but I was always denied promotion to the next job grade. I believe the Boston Walgreens district in which I worked has a "whites only" policy as regards career advancement and opportunity.

5.     **Job Restructuring.** Sometime in late 2012 or 2013 Walgreens announced a program to restructure its front store (non-pharmacy) store supervisory job grades. Prior to the restructuring program, the supervisory hierarchy was (from top to bottom): (a) store manager (b), assistant store manager, (c) management trainee (MGT) and (d) Shift Leader. The Shift Leader job is a non-management position. After the restructuring, the MGT job level would be eliminated and the front store supervisory hierarchy would be (top to bottom): (a) store manager, (b) assistant store manager, and (c Shift Leader. Again, the Shift Leader would be not be considered a "management" job. In addition, whereas an MGT might be paid $20-25/hour or more, the top pay for a shift leader would be $14.50/hour.

6.     **Not a Typical Reduction-in-Force.** This job restructuring exercise resembles a reduction in force (RIF) situation in the sense that Walgreens eliminated employee positions across the nation in many of its stores. In a typical reduction-in-force, the employer eliminates positions and, in most instances, the plaintiff will not be able to adduce proof that the employer hired, or replaced the plaintiff with, a similarly situated person outside the protected group because the employer redistributes the workload among the remaining employees. However, in the present case at Walgreens, work was not just redistributed among the remaining employees at the same job grade. Rather, employees in the MGT job grade were *redeployed or reclassified* into three categories: (a) promoted to the higher job grade of assistant manager; (b) demoted into

the lower job grade of Shift Leader; or, (c) discharged from the company. Accordingly, another way to look at the situation is say that as of a given date, all members of the MGT job grade were fired, some were immediately re-hired at a higher job grade (assistant manager) and some were immediately re-hired at a lower job grade (Shift Leader) using the procedure spelled out below.

7.     **Procedure for Promotion**. Walgreens outlined a procedure that determined

which MGTs would be promoted to assistant store manager and which ones would be demoted

to the Shift Leader job grade or be fired. For an MGT whose most recent job evaluation review

was at least satisfactory, the procedure was as follows: (1) the MGT would take a math test; (2) an MGT who achieved an acceptable score on the math test would then face a promotion job

interview panel consisting of current store managers; (3) an unspecified number of MGTs who

scored best on the math test and interview would then be promoted to assistant store manager;

and, (4) an MGT who was not promoted would be offered the opportunity of accepting a demotion to the Shift Leader position or be discharged from the company.

A primary claim of this complaint is that the *process* Walgreens used to redeploy and reclassify MGTs discriminated me personally and also against the classes of workers protected by the ADEA and Title VII of the Civil Rights Act of 1964. In the application of this process to employees in classes protected by the ADEA and/or Title VII, either (a) Walgreens decision makers purposefully treated such employees differently than other employees by disregarding and ignoring the positive superior test/interview scores; or (b) the process itself unfairly and unlawfully impacted members of the protected classes.

I believe and therefore allege that of all of the employees in protected classes just prior to the announcement of the job restructuring, NONE (or, a disproportionately small number) were eventually promoted to assistant manager. Only young, white MGTs who were not in the protected classes were promoted.

8. **Decision Makers.** Store managers, the district manager and community leaders *[A Walgreens community leader is a Walgreens store manager who oversees the stores of three to five or more other store managers on behalf of the district manager. The district manager, in this instance, Christopher Cogdill, was in charge of maybe 35 stores.]* were key decision makers as regards individual employee promotions within the district, and within any given "community" of stores. A promotion generally requires a recommendation from the employee's current community leader and store manager with the concurrence of the district manager.

9. **Walgreens's Process Railroaded (Coerced) MGTs in Protected Classes to Voluntarily Leave the Company or Accept Demotion.** Plaintiff is informed and believes and therefore alleges that most, if not all, of the MGT employees in the protected classes were forced to accept the demotion to the Shift Leader job. Those who refused, either left the company voluntarily under pressure or they were later discharged.

Tactics used by Walgreens management decision makers unfairly and unlawfully eliminated minority and older candidates from the pool of MGTs applying for promotion to the assistant manager job grade. And, these tactics were used against me. Long before the official start date of the promotion application process was announced, decision makers used the following tactics to eliminate me from the pool of MGTs competing for promotion:

a.      Warned me verbally that my real choices were either accept demotion to the Shift Leader job or start looking for a new job outside of Walgreens.

b.      Assigned me to a vacant Shift Leader job on a "temporary" basis and told me that I should either accept this job on a permanent basis or start looking for work outside of Walgreens.

c.      Demanded that I sign a document which gave me two choices: (a) accept demotion to a Shift Leader job; or (b) be discharged from the company.

When tactics "a" through "c" above did not deter me from seeking promotion through the published procedure outlined in "Procedure for Promotion" above, I was subjected to yet another unlawful and discriminatory tactic:

d.      The true positive scores I earned on both the math test and interview (I believe the interview was "scored") were disregarded and I was discharged, anyway, in favor of lesser qualified white employees not in the classes protected by Title VII and the ADEA.

Alternatively, the entire procedure used by Walgreens was discriminatory. I believe and therefore allege that none (ZERO, or a disproportionately small number) of the MGTs who were members of classes protected by the ADEA and Title VII were promoted to assistant manager. The claim is that the procedure itself illegally impacted members of protected classes. All (or, at least a statistically disproportionately large number) were either discharged or had left the company voluntarily under pressure prior to going through the procedure. Specifically, none (or, at least a statistically disproportionately small number) of the MGTs who were members of classes protected by the ADEA and/or Title VII who actually took the math test and interview were promoted.

10. **Candidates selected for promotion did not represent the pool of employees eligible for promotion.** I believe and therefore allege that the employees selected for promotion to assistant manager did not represent the makeup of the entire pool of employees eligible to apply for promotion in terms of race and age. In addition, in the almost 9 years I worked in district 106 (Boston South District) consisting of about 35 stores, there were zero (or, a disproportionately small number of) promotions of minorities and/or older workers from the MGT job grade to assistant manager.

11. I have submitted another document with this complaint ("Affidavit in Support of Complaint") which contains, among other information, a copy of the documents comprising the E.E.O.C Charge file.

## E.E.O.C. CHARGE

12. **Charge Filed**. I filed a complaint document with the Equal Employment Opportunity Commission sometime between October 23, 2014 and October 28, 2014 (see "Affidavit in Support of Complaint" document, pages 33-42). The information in this document was used to complete the official E.E.O.C. "Charge of Discrimination" document (see "Affidavit in Support of Complaint" document, pages 51-52).

13. **Defendant's Document.** In its response document dated January 14, 2015 (see "Affidavit in Support of Complaint" document, pages 56-57) the respondent made the following claims: (1) that I quit my job and therefore had no legal basis upon which to make a prima facie case under Title VII and the ADEA; (2) a workforce reduction in and of itself is a sufficient reason to bar a claim of racial and age discrimination; and (3) that I did not suffer an "adverse employment action" sufficient to trigger a Title VII or ADEA cause of action.

**All of Defendant's Arguments Were Off Base.**

14. **First**, I did not quit my job. As part of the job restructuring program, the job grade of MGT was *eliminated* all over the nation in all stores for all workers in that job grade. [See first paragraph of Document : "Walgreens Memorandum, Confirmation of Election to Step Down Or Separate" on page 44 of "Affidavit In Support of Complaint" filed with this complaint ]. And, I was given the choice to either accept demotion to a different job, Shift Leader, or be discharged. So, I did not quit my job.

Work in the MGT job grade was not just redistributed among remaining workers in the same job grade as might happen in a typical reduction in force situation. Rather, workers in the MGT job grade were *redeployed or reclassified* into three categories: (1) promoted to the higher job grade of assistant manager; (2) demoted into the lower job grade of Shift Leader; or, (3) discharged from the company. Accordingly, another way to look at the situation is to say that as of a given date, all members of the MGT job grade were fired, some were instantaneously re-hired at a higher job grade (assistant manager) and some were immediately re-hired at a lower job grade (Shift Leader) using the process announced by the company.

15. **Second**, the defendant claimed in their E.E.O.C. response that I had not suffered a so-called "adverse employment action" sufficient to trigger a Title VII or ADEA violation. However, my own research indicates that an adverse employment action can be evidenced by: termination of employment, a demotion concurrent with a loss in salary, a less distinguished job title, a material loss of benefits, or significantly diminished material responsibilities. *Brown v. Brody*, 199 F.3d 456-57. Walgreens offered me two choices: either accept the demotion to Shift Leader or be discharged. The shift Leader's top pay was $14.50 / hour. I believe my pay as an MGT was about $22.00/ hour. The MGT job was a management job with management

responsibilities. The Shift Leader job had no management responsibilities at all. Therefore, I would have suffered an "adverse employment action" if I had accepted the demotion to Shift Leader. Further, in *Dediol v. Best Chevrolet, Inc.*, the Court found that a "constructive discharge" occurs when either (a) the action involved a demotion to significantly reduced duties or salary or humiliating assignments that might include subjecting a senior employee to the supervision of a much younger, less experienced employee; and (b) repeated encouragements or demands for the employee to resign, particularly if coupled with threats that not resigning would result in a reassignment on significantly less favorable terms. *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435 (5th Cir. 2011). One of the claims made in my charge was that accepting a demotion to Shift Leader would have required me to work for much younger, less experienced, less qualified employees. And, another claim in my charge was that I was threatened both verbally and with a written document to accept demotion to a much lower level job or resign. Accordingly, I made ample claims in my E.E.O.C charge to establish that I had been subjected to both an "adverse employment action" and a "constructive discharge".

16.     **Third**, the defendant claimed in their response that a reduction in force is a "legitimate nondiscriminatory reason for termination".

Courts have generally not questioned an employer's decision that a reduction in force was necessary. E.g. *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 574, 578 n.5. However, courts will carefully consider the criteria, or process used by the employer for selection of affected employees to determine if unlawful discrimination is the true motive. E.g. *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1211-12.

In order to prove that an employer's selection process is discriminatory in reductions in force (RIF) cases, the plaintiff must produce either: (a) direct evidence that the employer "intended to discriminate against the plaintiff in reaching its RIF decision", *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767-68 (6th Cir. 2004); or, (b) the plaintiff must produce circumstantial evidence that the discharge occurred under circumstances giving rise to an inference of discrimination. See also, *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006).

My E.E.O.C. charge stated a claim of direct evidence that the employer intended to discriminate against me. I was forced to sign a document on January 15, 2014 (see "Affidavit in Support of Complaint" document, page 43), which should have been offered to me to sign only AFTER I had both: (a) gone through the employer's published process consisting of a math test and interview for promotion to assistant manager; and, (b) I had failed to get promoted. However, I was forced to sign this document on January 15, 2014, which gave me two choices: (a) accept a demotion to a lower level job; or, be discharged from Walgreens.

The official time deadlines for applying for promotion were announced within a week or two after January 15, 2014. So clearly, this was done to eliminate me from the pool of employees eligible to compete for promotion. I am informed and believe and therefore allege that younger, white employees, i.e., non-protected class members of the ADEA and/or Title VII were not subjected to this treatment.

I was eventually discharged on July 8, 2014 after taking the math test and having an interview. Walgreens management did not tell me my scores on the test and interview which I believe were very positive – they only told me that I had not been selected to be promoted. I believe that under court approved discovery to obtain test and interview scores, I will be able to prove that I was

unlawfully denied promotion in favor of younger, white employees not members of the classes protected by the ADEA and/or Title VII of the Civil Rights Act.

Where the plaintiff is able to produce persuasive direct evidence of the defendant's discriminatory intent, there is no need to resort to circumstantial evidence to establish a prima facie case, and therefore no need to use the McDonnell Douglas-Burdine inference framework. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506,511 (2002) (citing *Trans World Airlines Inc. v. Thurston*, 469 U.S. 111,121); *Paz v. Wauconda Healthcare & Rehab. Centre, LLC*, 464 F.3d 659, 666. However, circumstantial evidence can be used in the present case to establish a prima facie case as follows:

(a)     Where age discrimination is at issue, a plaintiff can meet his prima facie burden using a variation of the McDonnell-Douglas framework by establishing the following: (a) that he or she was the member of a protected class; (b) applied for and was qualified for a position; (c) was rejected; and (d) that younger employees were treated more favorably. *Oxman v. WLS-TV*, 846 F.2d 455 (7th Cir. 1988); and,

(b)     In a Title VII case, a plaintiff must assert: (a) that he or she was the member of a protected class; (b) applied for and was qualified for a position; (c) was rejected; and, (d) the employer retained employees that do not belong to the protected class. *Tomasso v. Boeing Company*, 445 F.3d 702, 706 n.4.

Accordingly, an examination of the E.E.O.C Charge (see "Affidavit in Support of Complaint" document, page 51-52) indicates that I provided ample claims in my E.E.O.C. charge to establish a prima facie case.

17.     **Fourth** and finally, in their response to the E.E.O.C., Walgreens made no attempt

whatsoever to explain the significance of the document ["Walgreens Memorandum,

Confirmation of Election to Step Down Or Separate", (see "Affidavit in Support of Complaint"

document, page 51-52)] that I was forced to sign in store manager Diane Peavey's office on

January 15, 2014, which I signed with the understanding that I had only two choices: accept a

demotion, or be discharged from the company. As regards this memo, the Defendant was silent

in their response to the E.E.O.C. Charge. This incident represented an attempt by Walgreens

management decision makers to coerce me into accepting a demotion rather than be allowed to

go through the announced application process for promotion. A defendant employer's silence in

similar situations has led courts to decide in favor of an aggrieved plaintiff. If "the trier of fact

believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the

court must enter judgement for the plaintiff." *Texas Department of Community Affairs v.

Burdine*, 450 U.S. at 254; accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

18.     **E.E.O.C. Decision**. The E.E.O.C. never contacted me to discuss the case or to ask me

questions they might have had. In their letter to me describing their decision ("Dismissal and

Notice of Rights", dated April 14, 2015 – see companion document "Affidavit in Support of

Complaint", page 54), they did not give me an explanation as to how they had reached their

decision. The form letter they gave me simply had a box checked which said:

>    *The EEOC issues the following determination: Based on its investigation, the EEOC is
>    unable to conclude that the information obtained establishes violation of the statutes.
>    This does not certify that the respondent is in compliance with the statures. No finding is
>    made as to any other issues that might be construed as having been raised by this charge.*

I do not believe that the E.E.O.C. has properly reconciled the relevant statutes and case law with the facts in this case. In particular, the E.E.O.C. did not directly address the materiality and relevance of the document I was forced to sign in store manager Diane Peavey's office on January 15, 2014. And, as noted earlier, the defendant did not address this document in their response to the E.E.O.C. charge. This document proves that the defendant willfully intended to discriminate against me as regards promotion opportunities. I believe and therefore allege that ALL (or, a disproportionately large number) of the MGT employees in this Walgreens district of some 35 stores who were members of protected classes were also treated in a similar unlawful manner.

An examination of the Walgreens's records during the discovery process of this case would prove this observation to be true for the entire district. I was hired into Walgreens in 2005 and was initially interviewed by a district manager whose last name was Keogh but he left the company less than a year later (I believe to join CVS). The present district manager, Christopher Cogdill, took over the district shortly after Mr. Keogh left the company. During Mr. Cogdill's tenure, I am not aware of any members of protected classes being promoted from the MGT job grade to assistant manager; and, I am not aware of any class members being promoted to the store manager job grade.

I believe **ALL** (or, a disproportionately large number) of the older workers and minority workers in district 106 have been victimized by race and/or age discrimination. Accordingly, this is not a frivolous action involving just my personal situation alone; it is just as much about all the other members of protected groups in the district as regards the ADEA and Title VII who have been denied a fair chance.

Walgreens's corporate policy as presented in published documents, some of which are displayed prominently in company break rooms, support equal employment opportunity. However, an examination of the facts in this case under the microscope of discovery will prove that Walgreens Boston South District 106 practices a de facto policy of "whites only" as regards equal employment opportunity and workplace diversity.

I therefore respectfully request that the District Court review this case and make a fair determination in terms of the facts and the applicable laws.

## GENERAL ALLEGATIONS

19.     I was employed by Walgreens from August 12, 2005 until July 8, 2014 and I worked in various stores in the Boston area. My job grade was MGT.

20.     I am an African American male and today I am 68 years old. At the time I was discharged from Walgreens in 2014, I was 67 years old.

21.     I was discharged from Walgreens on July 8, 2014.

22.     Sometime during the 2012 and 2013 timeframe, Walgreens announced a program to restructure its front store (non-pharmacy) supervisory job grades. The end result of this would be the elimination of the entire MGT job grade.

23.     Prior to the restructuring program there were four (4) job grades in the supervisory hierarchy as follows: (from top to bottom): (a) store manager (b), assistant store manager, (c) management trainee (MGT) and (d) Shift Leader. The Shift Leader job is a non-management position. After the restructuring, the MGT job level would be eliminated and the

front store supervisory hierarchy would consist of three levels as follows: (top to bottom): (a) store manager, (b) assistant store manager, and (c) Shift Leader. Again, the Shift Leader would be not be considered a "management" job.

24. The top hourly pay rate for a Shift Leader was $ 14.50/hour; the pay rate for an MGT might be $20.00 – 25.00/hour or more; and an assistant manager pay range might be a salary in the range $55,000 or more per year; and, store managers might earn a salary of $ 60,000 to over $ 100,000 (All dollar amounts are estimates and are used to show relative pay levels).

25. The work performed on a daily basis in a typical store can be split into the categories of: (a) work performed while on the store floor or in the stockroom ("floor work"); and (b) work performed while in the store office ("office work"). Almost all of the work performed on the store floor can be done by Shift Leaders, MGTs, assistant managers and store managers alike. Assistant managers are typically trained to assume all of the roles of a store manager on the store floor and in the office. MGTs and Shift Leaders were restricted in terms of the "office work" tasks they were authorized to perform – Shift Leaders were more restricted than MGTs. Some of the "office tasks" usually off limits for Shift Leaders and MGTs were: (a) processing the weekly payroll; (b) hiring and firing staff; (c) preparing weekly employee work schedules; (d) adjusting quantities in the weekly replenishment order received from the warehouse; and, (e) reconciling the accounting books to resolve financial anomalies, etc.

26. I hold an MBA degree in finance and operations from the University of Connecticut plus I have several years in management at other companies such as Travelers Insurance Company. During the eight plus years I worked at Walgreens, I was repeatedly passed over for promotion to the assistant manager job in favor of white candidates not as qualified as I was and not members of the classes protected by the ADEA and Title VII; and, most of the white candidates

had earned no more than high school diplomas and had little, if any prior management experience. The difference between the responsibilities of an assistant manager and those of a Shift Leader are essentially the "office work" responsibilities i.e., business administration and management responsibilities – which responsibilities I was more than qualified to perform due to my academic and prior management experiences.

27.     I believe and therefore allege that I was passed over for promotion in favor of lesser qualified white candidates who were not members of classes protected by the ADEA and/or Title VII at least three times: (a) sometime in the 2006-2007 timeframe; sometime in the 2011-2012 timeframe; and, in 2014.

28.     I applied for the assistant manager job grade using the published procedure for promotion in early 2014, but I was not promoted. Management did not give me a reason why I was not promoted. Subsequently, because I was not being promoted, I was given the choice of accepting a demotion to the job grade of Shift Leader or be discharged from the company. I chose to be discharged from the company.

29.     My discharge from Walgreens was a "constructive discharge" because the pay of an MGT was much higher than that of a Shift Leader. And, the MGT job was considered a management job and carried significantly more responsibilities than that of a Shift Leader.

30.     An MGT whose most recent evaluation was satisfactory ostensibly was allowed to go through the published procedure to get promoted to the assistant manager job grade. However, I believe and therefore I allege that, most, if not all, of the minority and/or older MGTs who were members of classes protected by the ADEA and Title VII were subjected to unlawful threats and coercion prior to being given an opportunity to apply for the assistant manager job. Such MGTs

were coerced into voluntarily accepting a demotion to the Shift Leader job under the threat that they would be discharged if they did not voluntarily accept the demotion.

31.     I was eligible to apply for the assistant manager job, and, I am informed and believe and therefore I allege that I was subjected to unlawful threats and coercion prior to being given an opportunity to actually apply for the assistant manager job. I believe I was coerced into voluntarily accepting a demotion to the Shift Leader job under the threat that I would be discharged if I did not voluntarily accept the demotion.

VERBAL, WRITTEN AND JOB ASSIGNMENT THREATS WERE USED TO FORCE ME TO ACCEPT A DEMOTION OR SEPARATE FROM THE COMPANY

32.     I personally was subjected to various tactics involving unlawful threats and coercion by Walgreens managers who were decision makers as regards the promotion to assistant manager. From the time in 2012 or 2013 when the restructuring plan was first announced, and continuing until 2014 (the year I was discharged), Walgreens store managers and community leaders told me that I should either accept a demotion to the Shift Lead job or start looking for a job outside of Walgreens. Getting promoted was not an option. Management demonstrated their discriminatory intentions via verbal and written threats; and via a temporary assignment to a Shift Leader job. These acts of coercion emphasized the same theme: accept demotion to the Shift Leader job grade or separate from Walgreens (either voluntarily or by being discharged).

33.     **Written Coercion/Threat**. On January 15, 2014, Mrs. Diane Peavey, my store manager at the time, called me into her office and told me in the presence of the store's assistant manager

(Mrs. Bernadette Walls) that I would be terminated on February 7, 2014 unless I agreed to step down to a Shift Leader position. In addition, she told me that I had to make a decision that day during that particular meeting in her office. I would have no time to mull it over or think about it. I chose to separate from the company and I signed the *Confirmation of Election to Step Down or Separate* memo as directed [see page 43 of "Affidavit In Support of Complaint" filed with this complaint]. I asked for and received a copy of the signed document which I put in my locker. About 10 minutes after this meeting, Mrs. Peavey called me back into her office and she told me that the community leader wanted to talk to me on the phone. Someone on the phone who identified himself as Bob Nash, the community leader of Mrs. Peavey's store, told me that I should tear up the document that I had just signed (in which I had agreed to leave the company on February 7th) and pretend it never happened. He said that he would give me the same document to sign few weeks later and if I then signed it, I would get a better severance package when I left the company – nine weeks instead of eight weeks. The official start of the application process for assistant manager had not yet been announced. And, at the time, I didn't know when the date the process would begin. However, the application process beginning date was officially announced a week or two later. This episode was an attempt to coerce me into voluntarily accepting demotion to the Shift Leader job grade – in writing.

34. **Verbal Coercion/Threat**. During the meeting in Diane Peavey's office (January 15, 2014) where I was ordered to sign the *Confirmation of Election to Step Down or Separate document,* she told me that since I would not voluntarily accept demotion to Shift Leader, I should immediately begin looking for a job outside of Walgreens. Also, during this meeting, the community leader for Mrs. Peavey's store, Bob Nash, told me on the phone that within a few

weeks, he would give me another *Confirmation of Election to Step Down or Separate document* with a later discharge date – even though I had not been given the opportunity to go through the published procedure for promotion to the assistant manager jog grade. On January 15, 2014, the date of this conversation, I didn't know the date the job application process would begin. The application process beginning date was officially announced a week or two later. So, both the store manager and community leader told me that I would be discharged soon, if I did not voluntarily accept a demotion.

35.     **Verbal Coercion/Threat**. When I worked in the Norton, Ma. Walgreens store (No. (02781) between 05/21/11 – 11/17/2013, the store manager, Ann-Marie Piana and the community leader, Richard Anderson urged me to accept a demotion to the Shift Lead job whenever Mr. Anderson visited the Norton store. Then periodically, maybe once per month (probably at the behest of the community leader), Mrs. Piana would ask me if I wanted to step down to the Shift Lead job. When I told her I would not accept a demotion, she strongly urged me to start looking outside of Walgreens for another job.

36.     **Coercion/Job Assignment**. Sometime during 2013 while I was nominally employed as an MGT and assigned to the Norton, Ma. Store, a Shift Leader resigned from the Walgreens store in Sherborn, MA. During the two-four month period it took to hire someone to permanently fill the position, Richard Anderson, the community leader of both the Norton and the Sherborn stores , insisted that I fill-in on a temporary basis.

He used his authority over the Norton store manager (Mrs. Piana) to order me to work in the Sherborn store as a Shift Leader. Both he and Mrs. Piana (I believe under pressure from Mr. Anderson) continuously told me that I should accept a demotion to the Shift Leader job grade and permanently work in Sherborn as a Shift Leader. Further, both asserted that my clear choices

in the MGT job restructuring process were: accept the Sherborn job or separate from the company.

37. The verbal, written and job assignment threats and coercion constituted direct evidence of Walgreens's intent to discriminate against me. Either I should accept a demotion to Shift Leader or leave the company. This conduct demonstrated that Walgreens management decision makers had no intention of determining my status for promotion in terms of the published procedure, which was: (a) a math test; (b) a job interview; and, (c) promote the candidates who scored best on both the math test and interview. I had not been given the math test or interview but yet I was repeatedly being strong-armed (verbally, in writing and through a job assignment) into voluntarily accepting a demotion to the Shift Leader job. The clear message of these tactics was: accept the Shift Leader job or be discharged.

38. **Most MGTs in Protected Classes Accepted Demotion or Voluntarily Separated.** I am informed and believe and therefore allege that the unrelenting pressure and threats levied against minority and older workers caused a large number to either voluntarily look for and find a new job outside of Walgreens or voluntarily accept a demotion to the Shift Leader job grade under the threat of being discharged. Those eligible for promotion who did not separate from Walgreens and did not voluntarily accept the demotion to the Shift Leader job grade, were ostensibly allowed to continue on to apply for the assistant manager job (a promotion) using the published procedure. I was subjected to this pressure also and when I refused to voluntarily accept demotion, I was allowed to go through the promotion process.

39. **Few if Any Protected Class Members Promoted.** I believe and therefore allege that none (or a disproportionately small number) of the members of classes protected by the ADEA and/or Title VII who went through the published procedure for promotion were eventually

promoted. *More importantly, to the best of my knowledge and belief, none (or a disproportionately small number) of such protected class members who were eligible to seek promotion when the job restructuring plan was first announced were eventually promoted to the assistant manager job grade.*

40. **Very Few MGTs Who Were Members of Protected Classes Actually Available When the Application Process Began.** I am informed and believe and therefore I allege that the unrelenting pressure and threats levied against minority and older workers caused a large number to either voluntarily look for and find a new job outside of Walgreens or voluntarily accept a demotion to the Shift Leader job grade under the threat of being discharged. So, the pool of available MGTs eligible to apply for promotion was greatly diminished.

41. **Remaining MGT Pool Too Small.** Due to Walgreens's unlawful and discriminatory coercion tactics which eliminated a large number eligible MGT employees who were members of the protected classes from the pool of eligible applicants, I believe and therefore allege that the pool of MGT employees seeking promotion to the assistant manager job grade was too small to fill all of the expected vacancies.

42. **Young, White Employees Added to Pool.** I am informed and believe and therefore allege that Walgreens augmented the pool of employees eligible to apply for promotion to the assistant manager job grade with younger, white employees who were already Shift Leaders. Some of these white Shift Leaders were in their twenties but most, if not all, were under the age of 40. I believe and therefore allege that none of these candidates were in classes protected by the ADEA and/or Title VII.

43. **White Applicants Added to Pool Had Less Education.** I am informed and believe and therefore allege that most, if not all, of the white applicants who were added to the pool of MGTs eligible to apply for promotion to assistant manager, had less business education than I had. I believe that most had a high school diploma as their highest education level in business. I had an MBA.

44. I believe and therefore allege that most, if not all, of the white applicants who were added to the pool of MGTs eligible to apply for promotion to assistant manager, had less, or at best about the same, business education as the pool of MGT protected class members.

45. **White Applicants Added to Pool Had Less Experience.** I am informed and believe and therefore allege that most, if not all, of the white applicants who were added to the pool of MGTs eligible to apply for promotion to assistant manager, had less general management experience than I had. I had worked as a manager in several corporations prior to coming to Walgreens. I believe and therefore allege that most, if not all, of the white applicants were in high school prior to coming to Walgreens. I believe and therefore allege that most, if not all, of the white applicants who were added to the pool of MGTs eligible to apply for promotion to assistant manager, had less, or at best about the same, experience working at Walgreens in a supervisory role as I had.

46. I believe and therefore allege that most, if not all, of the white applicants who were added to the pool of MGTs eligible to apply for promotion to assistant manager, had less, or at best about the same, supervisory experience gained prior to coming to Walgreens as members of classes protected by the ADEA and Title VII. I believe and therefore allege that most, if not all, of the white applicants who were added to the pool of MGTs eligible to apply for promotion to

assistant manager, had less, or at best about the same, experience working at Walgreens in a supervisory role as members of classes protected by the ADEA and Title VII.

47. **Favored Treatment - White Employees Coached**. I am informed and believe and therefore allege that most, if not all, of the white employees in the pool of employees who actually went through the math test/interview process for promotion were coached by a member of the district office training department as to how to score higher on both the test and the interview during formal scheduled training sessions.

48. **Favored Treatment – Whites Not Coerced, Not Pressured To Accept Demotion or Separate.** I believe and therefore allege that none of the white applicants not protected by the ADEA and/or Title VII were ever coerced into accepting a demotion to the Shift Leader job grade or coerced into separating from the company prior to being given an opportunity to apply for the assistant manager job.

49. I am informed and believe and therefore allege that I was threatened and coerced into accepting a demotion to the Shift Leader job; or, be discharged. These threats and coercion indicated the discriminatory intent of the Walgreens decision makers.

# MY TEST AND INTERVIEW SCORES WERE DISREGARDED. DECISION MAKERS TREATED ME DIFFERENTLY THAN OTHER CANDIDATES

50. As regards the scores I earned on my math test and job interview, Walgreens management decision makers treated me differently than they did applicants for promotion to assistant manager who were not members of classes protected by the ADEA and/ or Title VII.

51. I had applied for promotion in the 2006 – 2007 time frame and as part of that exercise I took a paper version of the math test and the district employee administering the test told me I had a perfect score. There was also a job interview involved. I was told that I didn't get promoted because there were better candidates. I believe the decision makers ignored the scores I made on the math test and interview in order to unlawfully promote lesser qualified white and younger (under age 40) candidates not members of classes protected by the ADEA and/or Title VII.

52. I again applied for promotion in the 2011 – 2012 time frame. I took the computer based math test in the office of the store manager/community leader of the Stoughton, MA store, Mrs. Kelly Zbyszewski. She personally proctored me and when she had to leave the office to attend to store business, the district training manager, Ms. Heather Wojcik, proctored me. When scores from all of the candidates were available a few weeks later, Mrs. Zbyszewski notified me and advised me to get my test score and rank (among all candidates) from my then store manager, Richard Anderson. He told me that my test score and rank were "confidential" and that he would not give them to me. According to the published rules, the top scoring applicants on the math test for the assistant manager job were supposed to go on to the interview stage. Then, the top candidates from the test and interview were to be promoted.

I believe and therefore allege that my math test score was very high and that I was denied an opportunity to go to the interview step of the job application process because of my age and/or race. I believe therefore that I was discriminated against so candidates not members of classes protected by the ADEA and/or Title VII could be promoted.

53.    In 2014, I worked in the Bridgewater, MA store. The store manager was Mrs. Diane Peavey and the community leader was Bob Nash. The formal test/interview procedure began, I believe, sometime in February or early March 2014. I took the computer based math test and was subsequently allowed to go through the interview.

But once again, I was not given my scores on the interview or math test by the store manager, Mrs. Peavey, who delivered the news to me that I would not be promoted. She simply told me that all of the candidates for promotion had been selected and that I had not been selected. I believe and therefore allege that I was passed over for promotion so that candidates not members of the classes protected by the ADEA and/or Title VII could be promoted.

54.    I hold both BS and MS degrees in mathematics; and an MBA degree. Plus, I had 8 plus years of experience working at Walgreens. I believe that I scored well on the math test each time I took it; and, I believe I scored well on the job interview in 2014. Each time I applied for promotion, I was rejected. I believe I was rejected because Walgreens management decision makers chose to ignore or disregard the scores I earned on the math test and interview which comprise the procedure for promotion to assistant manager. Instead, these decision makers favored and promoted candidates not protected by the ADEA and/or Title VII.

55.    I believe and therefore allege that none (or, a disproportionately small number) of the members of classes protected by the ADEA and Title VII and who went through the published process for promotion were eventually promoted. I further allege that decision makers deliberately treated these candidates differently in favor of younger, less qualified members not in the protected classes by disregarding the scores earned by protected class members.

56.     I believe and therefore allege that the Walgreens decision makers treated me differently than other candidates by ignoring and disregarding my test and interview scores in order to favor lessor qualified white candidates who were not members of classes protected by the ADEA and/or Title VII.

57.     I believe and therefore allege that the Walgreens decision makers treated me differently because of my age and race in violation of the ADEA and Title VII of the Civil Rights Act of 1964, as amended.

THE PROCESS USED BY WALGREENS TO DETERMINE WHICH CANDIDATES WOULD BE PROMOTED TO ASSISTANT MANAGER UNLAWFULLY AND UNFAIRLY EXCLUDED MEMBERS OF CLASSES PROTECTED BY THE ADEA AND TITLE VII

58.     I believe and therefore allege that ALL (or, a disproportionately large number) of the MGT candidates who were members of classes protected by the ADEA and Title VII were unfairly and illegally excluded for promotion by the published promotion process itself.

59.     Bottom line statistics present the results of an employer's overall selection process rather than those of a single component in that process, such as a particular scored test or other selection device. Walgreen's selection process consisted of two components: (1) a math test; and (2) a job interview.

60. I believe and therefore allege that either the math test, or the job interview, or both taken together unfairly impacted members of protected classes such that ALL (or, a disproportionately large number) of the members failed to get promoted. I believe that I was negatively impacted by the published promotion procedure.

61. I believe and therefore allege that the basis for this negative impact on MGT classes protected by the ADEA and Title VII was not a business necessity.

62. Under a bottom line analysis, taking the application process as a whole into consideration, NONE (or, a disproportionately small number) of the ADEA and/or Title VII protected class job applicants who went through the published procedure were promoted.

63. I was qualified to apply for promotion, I applied for promotion, and, was rejected for promotion using this procedure.

64. The process used by Walgreens to determine which candidates would be promoted to assistant manager, caused a disproportionately large number of members of classes protected by the ADEA and Title VII to fail to get promoted; and, I believe the reason for this exclusion was not based on a business necessity.

65. Under a bottom line analysis, the procedure used by Walgreens to determine which candidates would be promoted to assistant manager, favored white applicants who were not members of classes protected by the ADEA and/or Title VII of the Civil Rights Act of 1964, as amended.

66. I believe and therefore allege that the pool of MGTs and others who were actually promoted using the published process did not have the same racial and/or age composition as did the pool of eligible MGT candidates at the beginning of the MGT job restructuring process.

67. I believe and therefore allege that I was excluded by the published promotion process and that this exclusion was in violation of the ADEA and Title VII of the Civil Rights Act, as amended and; and this exclusion was not based on a business necessity.

## FIRST CAUSE OF ACTION

Violation of Title VII of Civil Rights Act of 1964, as Amended)

68. The allegations of each of the preceding paragraphs are re-alleged and incorporated here by reference.

69. Walgreens decision makers purposefully coerced and strong-armed plaintiff into voluntarily accepting a lower level job in order to promote younger, less qualified white candidates. Walgreens employed verbal, written and job assignment threat and coercion tactics in order to unfairly and illegally force plaintiff and others in the class protected by Title VII to either (a) voluntarily leave the company; or, (b) accept a job which amounted to a demotion in pay and responsibilities; or (c) be discharged from the company.

70. These threat and coercion tactics demonstrated Walgreens's discriminatory intent to refuse to promote the plaintiff and others in the class protected by Title VII regardless of how well the plaintiff and other protected class members scored in the process used to determine which candidates would be promoted.

71.     Plaintiff applied for promotion in 2014 and was rejected. Plaintiff was then given the choice of accepting a demotion to Shift Leader or be discharged.

72.     A demotion to Shift Leader constituted an "adverse employment action".

73.     Plaintiff was discharged from Walgreens on July 8, 2014 and this constituted a "constructive discharge".

74.     Plaintiff was as qualified or more qualified for the sought job promotion to assistant manager as were candidates who were not protected by Title VII.

75.     Walgreens threat and coercion tactics demonstrated discriminatory intent and by refusing to promote the plaintiff, Walgreens violated plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended.

### SECOND CAUSE OF ACTION

Violation of Title VII of Civil Rights Act of 1964, as Amended)

76.     The allegations of each of the preceding paragraphs are re-alleged and incorporated here by reference.

77.     Walgreens management decision makers deliberately ignored plaintiff's positive, superior scores on the math test and job interview in order to promote lessor qualified white candidates not members of the class protected by Title VII.

78.     Walgreens therefore violated the plaintiff's rights under Chapter VII of the Civil Rights Act of 1964, as amended.

## THIRD CAUSE OF ACTION

### (Violation of Title VII of Civil Rights Act of 1964, as Amended)

79. The allegations of each of the preceding paragraphs are re-alleged and incorporated here by reference.

80. The published procedure used by Walgreens to determine which candidates would be promoted to assistant manager unfairly and illegally rejected ALL (or, a disproportionately large number) of the minority and/or older MGT candidates.

81 The published procedure used by Walgreens to determine which candidates would be promoted to assistant manager favored lessor qualified white candidates and unfairly rejected members of the class protected by Title VII.

82. Walgreens therefore violated the plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended.

## FOURTH CAUSE OF ACTION

### (Violation of Age Discrimination in Employment Act of 1967, as Amended)

83. The allegations of each of the preceding paragraphs are re-alleged and incorporated here by reference.

84. Walgreens decision makers purposefully coerced and strong-armed plaintiff into voluntarily accepting a lower level job in order to promote younger, less qualified white candidates. Walgreens employed verbal, written and job assignment threat and coercion tactics in order to unfairly and illegally force plaintiff and others in the class protected by the ADEA to

either (a) voluntarily leave the company; or, (b) accept a job which amounted to a demotion in pay and responsibilities; or (c) be discharged from the company.

85.     These threat and coercion tactics demonstrated Walgreens's discriminatory intent to refuse to promote the plaintiff and others in the class protected by the ADEA regardless of how well the plaintiff and other protected class members scored in the process used to determine which candidates would be promoted.

86.     Plaintiff applied for promotion in 2014 and was rejected. Plaintiff was then given the choice of accepting a demotion to Shift Leader or be discharged.

87.     A demotion to Shift Leader constituted an "adverse employment action".

88.     Plaintiff was discharged from Walgreens on July 8, 2014 and this constituted a "constructive discharge".

89.     Plaintiff was as qualified or more qualified for the sought job promotion to assistant manager as were candidates who were not protected by the ADEA. Walgreens management decision makers did not utilize these tactics with candidates not protected by the ADEA.

90.     Walgreens threat and coercion tactics demonstrated discriminatory intent and by refusing to promote the plaintiff, Walgreens violated plaintiff's rights under the Age Discrimination in Employment Act of 1967

## FIFTH CAUSE OF ACTION

(Violation of Age Discrimination in Employment Act of 1967, as Amended)

91.     The allegations of each of the preceding paragraphs are re-alleged and incorporated here by reference.

92.     Walgreens management decision makers deliberately ignored plaintiff's positive, superior scores on the math test and job interview in order to promote lessor qualified white candidates not members of the class protected by the ADEA.

93.     Walgreens therefore violated the plaintiff's rights under the Age Discrimination in Employment Act of 1967, as amended.

## SIXTH CAUSE OF ACTION

(Violation of Age Discrimination in Employment Act of 1967, as Amended)

94.     The allegations of each of the preceding paragraphs are re-alleged and incorporated here by reference.

95.     The published procedure used by Walgreens to determine which candidates would be promoted to assistant manager unfairly and illegally rejected ALL (or, a disproportionately large number) of the minority and/or older MGT candidates.

96.     The published procedure used by Walgreens to determine which candidates would be promoted to assistant manager favored lessor qualified white candidates and unfairly rejected members of the class protected by the ADEA.

97.     Plaintiff was rejected for promotion because of his age, and candidates not protected by the ADEA were favored and were promoted.

98.     Walgreens therefore violated the plaintiff's rights under the Age Discrimination in Employment Act of 1967, as amended.

If the Court does not grant relief, I will be irreparably denied rights secured by Title VII of the Civil Rights Act of 1964, as amended, and by the Age Discrimination in Employment Act of 1967, as amended.

WHEREFORE, plaintiff prays that:

A.      The Court appoints legal counsel.

B.      The Court grants Attorneys fees and costs.

C.      The Court orders my reinstatement to the job grade of assistant manager with back pay.

D.      The Court Grants other relief as may be appropriate including, injunctive orders and damages.

7/10/15

James S. Greene, Pro Se          Date
P.O. Box 603
Norwood, MA 02062
781-255-9253