UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-12949-RGS

JAMES S. GREENE

v.

WALGREEN EASTERN CO., INC.

MEMORANDUM AND ORDER ON DEFENDANT WALGREEN'S
MOTION FOR SUMMARY JUDGMENT

November 18, 2016

STEARNS, D.J.

James S. Greene, a *pro se* plaintiff, brought this action against his
former employer, Walgreen Eastern Co., Inc. (Walgreens), alleging that it
discriminated against him on the basis of his race in violation of Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Counts I, II, and III),
and his age in violation of the Age Discrimination in Employment Act
(ADEA), 29 U.S.C. § 621 *et seq.* (Counts IV, V, and VI).  Limited by the timing
of his November 20, 2014 filing with the Massachusetts Commission Against
Discrimination (MCAD),[1] Greene raises actionable claims of race and age

_____

[1] In his Complaint, Greene contends that Walgreens unlawfully denied
him promotions in 2006-2007, 2011-2012, and 2014. Greene filed a charge
of discrimination with the MCAD on November 20, 2014.  In an Order dated
April 14, 2016, the court found that "only the 2014 denial was filed within the

discrimination with respect to Walgreens' failure to promote him in 2014.

Greene alleges discrimination theories based on both disparate treatment

and disparate impact.[2]  Walgreens now moves for summary judgment on all

counts.

BACKGROUND

The facts, taken in the light most favorable to Greene as the nonmoving

party, are as follows.[3]  Greene is an African-American man who worked for

Walgreens from 2005 until 2014 as a Management Trainee (MGT).  During

---

applicable 300 days."  Dkt #40.  Consequently, the court does not address the portions of Greene's Opposition dedicated to the alleged earlier rejections.

[2] In his Opposition to summary judgment, Greene pleads, for the first time, that this is a reduction in force case.  "Plaintiffs may not raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.  Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled."  *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) (internal citations omitted).  Notwithstanding, Walgreens notes in its Reply that there is no evidence that it failed to act neutrally in eliminating the management trainee position nationwide.  Def.'s Reply at 3.  In fact at his deposition Greene was asked, "Is it your belief that this was done specifically because of you, the restructuring of the company and the jobs? Answer: No."  Greene Dep. at 51-52.

[3] Greene objects to four of Walgreens' stated facts.  See Dkt #69 at 49-51 ("Defendants undisputed facts disputed by plaintiff").  None of these disputed facts have a bearing on Walgreens' dispositive motion.

his tenure at the company, Greene worked at several Walgreens stores in southeastern Massachusetts, in a territory designated as "District 106." When Greene left Walgreens, he was working at the District 106 Bridgewater store.

In 2012, Walgreens decided to revamp its store management structure. The company eliminated the MGT position in all of its stores nationwide, and replaced it with a new position titled Assistant Store Manager-Trainee (ASM-T).[4]  All existing MGTs were either to be transferred to the new ASM-T position, demoted to a non-management "Shift Lead" position, or terminated.[5]  Walgreens' minimum qualifications for promotion to the ASM-T position were: (1) a rating of "Achieving Expectations" on a 2013

---

[4] While Walgreens' Statement of Facts (SOF) suggests that the ASM-T position simply redefined the MGT position in the corporate structure, both parties characterize an employee's move from being an MGT to an ASM-T as a promotion.

[5] Elimination of the MGT position was scheduled in three waves.  Wave One took place in early 2014, directed at the MGTs who were not eligible to apply for the ASM-T position.  Wave Two occurred in the Spring of 2014, affecting MGTs who were eligible to apply but who either chose not to, or applied and were not selected for an interview.  Greene figured in Wave Three in the Summer of 2014 targeted for MGTs who applied and were interviewed but who were not ultimately promoted.  These employees could either take a lesser position or separate from the company with severance pay. Def.'s SOF ¶¶ 26-30.

performance review, (2) a high school diploma or GED, and (3) no written disciplinary actions during the prior 12 months.

It is undisputed that Greene met the three entry-level qualifications. Greene alleges that notwithstanding his advanced degrees and exemplary work history, his supervisors repeatedly discouraged him from applying for an ASM-T position, and instead urged him to step down to the Shift Lead level.[6]  On January 15, 2014, Greene's immediate supervisor, Diane Peavey, presented him with a memorandum giving him the option of accepting a Shift Lead job or separating from the company, and demanded that he "sign it today."  Greene Dep. at 102.  Greene elected to resign and signed the document.   However, shortly afterwards, Bob Nash, a Walgreens' "community leader"[7] notified him that he had been given the memorandum by mistake and that he was in fact eligible to apply for a promotion to an ASM-T position.  Greene decided to remain at Walgreens.[8]

---

[6] Greene holds a bachelor's degree and a master's degree in mathematics, a master's degree in business administration, and a master's degree in telecommunications.

[7] "A community leader is a store manager who oversees 5 or more stores on behalf of a district manager."  Pl.'s Opp'n at 31.

[8] Greene alleges that the mistake was in fact a "bluff" to discourage him from applying for a promotion.  Peavey's testimony is that Greene had only transferred into her store two weeks before, and that she was unaware at the

Walgreens' ASM-T selection process had three components; for each component, the applicant received a numerical score from 1 to 5, with 5 being the highest possible score.[9]   First, eligible applicants were to complete a mathematics examination administered through a computer.  The math test was composed of thirty math questions "measuring low-level job-related retail math skills." Gerjerts Decl. ¶ 7 (Dkt #73-2). It included questions about "measuring calculations of gross profits, costs, retail profits, and pro-rated ad prices."   *Id.*   Second, district managers asked patterned questions of the applicants' supervisors regarding his or her job skills, utilizing "an anchor rating scale to rate job-related competencies" relevant to the ASM-T position.  *Id.* at 7, 11 (Overview of ASM-T Selection Process). The skills included "Knowledge of Company Policies and Procedures; Ability to Learn and Work Under Pressure; Valuing the Customer; [and] Being Motivated and Ethical & Honest." *Id.* ¶ 8.  This process, termed the Internal Reference

---

time that Greene was eligible to apply for the promotion. *See* Peavey Decl. ¶¶ 8-14 (Dkt #47-4).

[9] The candidates' numerical scores were then grouped into five distinct rating "bands."  Def.'s SOF ¶ 36.  Walgreens considered candidates within the same "band" to be equally qualified even though the candidates' numerical scores differed slightly.  The bands were as follows: "Very Highly Recommended," "Highly Recommended," "Recommended With Some Caution," "Recommended with Serious Caution," and "Not Recommended." *Id.*

Review (IRR), took "about 45 minutes to complete." *Id.* at 7.  Finally, applicants who achieved a minimal level of competency on the first two measures were invited to an interview.  Interviewers asked nine specific questions, common to all applicants, "relating to ASM-T job competencies . . . assessing how applicants handle certain job-related situations and . . . the applicant's ability to manage the store and others." *Id.* ¶ 9.  The interviewers were provided a rubric with which to evaluate the applicants' responses.  The interviews were conducted by a panel consisting of at least two Walgreens managers – individuals to whom the candidate did not report – and "took about 30-45 minutes to complete." *Id.*  The candidate's performance on the three components was then weighted and aggregated to determine his or her overall score.  The mathematics exam comprised 15% of the rating, the IRR performance review 35%, and the interview evaluation the remaining 50%.

On the mathematics exam, Greene received a score of 4.06 out of 5, placing him in the band of "Highly Recommended."  Greene received a 3.11 on the IRR component which correlated to the band of "Recommended with Serious Caution."  His combined IRR/math score, after weighting, was 3.4, also corresponding to the band of "Recommended with Serious Caution."  All applicants with a combined IRR/MA rating within the "Recommended with

Serious Caution" band or above were invited to interview for the ASM-T position; fifteen employees in Greene's cohort chose to do so.[10]

"The panel that interviewed Greene consisted of three individuals to whom Greene did not report – Community Leaders Geoff Robinson, Kelly Zbyszewski and Todd Halliwell." Def.'s SOF ¶ 40. At his interview, Greene received a score of 2.08 – "Not Recommended" – the third-lowest score of the fifteen candidates.[11] *See* Dkt #47-3 at 42. After the interview score was combined with the math and IRR components, Greene had a final composite score of 2.74, again the third-lowest among the candidates. Walgreens promoted the top eleven candidates based on the final composite scores. Of the candidates who reached the interview stage, Walgreens advanced two who were over the age of 40 (42 and 59) and nine who were under the age of 40; all eleven successful candidates are white. Conversely, all four of the rejected candidates were over 40, and none of them is white.[12]

---

[10] This included Greene, as well as four applicants with lower combined IRR/math scores than Greene's, one of whom was ultimately promoted because of a higher interview score. Two candidates who were invited to interview withdrew their applications; both were nonwhite.

[11] Walgreens states that the interviewers noted that Greene's answers were "vague and/or contradictory . . . [and] conveyed more of an hourly team member mindset than a manager's mindset." Def.'s SOF ¶ 42.

[12] Another rejected candidate is African-American; a third is Hispanic, and the fourth is Asian-American.

On June 12, 2014, after Greene's application for an ASM-T promotion had been denied, Peavey again offered Greene the choice of stepping down to a "Shift Lead" position or separating from Walgreens.  Greene elected to leave the company, but declined to take a severance package.  Greene was 67 years old when he resigned from Walgreens.

In November of 2014, Greene filed a complaint against Walgreens with the Equal Employment Opportunity Commission (EEOC) alleging that Walgreens had discriminated against him by failing to promote him to the ASM-T position.[13]   The EEOC dismissed the complaint in April of 2015. Greene filed this action on July 10, 2015.  Following discovery, Walgreens moved for summary judgment.  Greene filed an Opposition on September 12, 2016.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment will not be granted if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*

---

[13] Greene did not timely file administrative charges for the two prior promotion denials that he alleges occurred between 2006 and 2011.  Greene Dep. at 72-74.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of establishing that no genuine issue of material fact exists.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant carries its burden, the nonmovant must show more than a "metaphysical doubt" as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"In a wrongful termination case under the ADEA, the plaintiff must establish 'that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age.'"  *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993), quoting *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir. 1988); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).  Similarly, Title VII provides:

> [that it] shall be an unlawful employment practice for an employer —
>
> (1)     to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e−2(a)(1).  It is undisputed that Greene is an employee covered by Title VII and the ADEA.  *See Walters v. Metro. Educ. Enters., Inc.,* 519 U.S. 202, 206 (1997) ("[T]he employment relationship is most readily demonstrated by [an] individual's appearance on the employer's

payroll."). In reviewing Greene's claims, "the ADEA and Title VII stand[ ] in pari passu" and "judicial precedents interpreting one such statute [are] instructive in decisions involving [the other]." *Serapion v. Martinez*, 119 F.3d 982, 985 (1st Cir. 1997).

Greene offers no direct evidence of discrimination. The court will therefore analyze his claims under the burden-shifting formula set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this formula, Greene must first demonstrate a prima facie case of discrimination. If Greene succeeds in establishing a prima facie case, the burden of production shifts to Walgreens to offer a legitimate, nondiscriminatory reason for denying Greene a promotion. The burden then shifts back to Greene to show that Walgreens' proffered reasons are pretextual and mask unlawful discrimination.

The parties initially dispute whether Greene has successfully made out a prima facie case of discrimination. In the context of a failure to promote, Greene must show that (1) he was a member of a protected class; (2) he was qualified for an open position; (3) he was denied the position; and (4) that the position was given to someone with similar or inferior qualifications. *Ahmed v. Johnson*, 752 F.3d 490, 496 (1st Cir. 2014). The parties' disagreement is focused on Greene's qualifications in relation to those

10

candidates selected for promotion. The court will assume a prima facie case as the issue of Greene's qualifications for promotion is the same whether analyzed as an element of his prima facie case or at the second and third stages of the burden-shifting inquiry. *Cf. Coward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999).

### Disparate Treatment

Greene alleges that he was qualified for the ASM-T position, but was subjected to "disparate treatment" during the hiring process because of his race and age. Greene maintains that with 30 years of experience as a manager in major corporations and after having served as a management trainee at Walgreens for nearly nine years, he was more qualified than the other candidates, and that he was denied the promotion because of animus on the part of his store manager Diane Peavey and community leader Bob Nash.[14] As evidence, Greene claims that Peavey, together with Nash, repeatedly discouraged him from applying for a promotion, pressured him to accept a non-management position, and failed to follow protocol in asking

---

[14] Greene expresses his personal doubt that "[a] white SFL [shift leader] as young as age 24 with a high school diploma will score higher on business math tests that a black candidate with BS and MS degree in mathematics; has successfully completed business math courses as part of an MBA degree; and, who in 2005 . . . passed the certification tests required to teach math in Massachusetts public schools." Pl.'s Opp'n at 30.

him to accept a demotion or separation − "a deviation from Walgreens' 'standard business practice.'"[15]   Pl.'s Opp'n at 24, quoting *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 68-69 (1st Cir. 2008) .

As part of his disparate treatment claim, Greene also complains that if "[e]mployees were evaluated for the position based on their competencies . . . Walgreens never states the nature of those skills, knowledge and abilities." Pl.'s Opp'n at 31.  Greene adds "that the IRR and interview portions of the selection process were highly subjective, . . . [and] that District 106 personnel could have assigned any scores desired at any time to the [shift leader] candidates" as its personnel "were authorized to edit and change selection process scores." *Id.* at 32.

Kyle Gerjerts, the senior manager of Walgreens Talent Management department, testified to the specific skills, work behavior, and future performance prediction that the interview, performance reviews, and mathematics exam intended to measure.   It is true that Walgreens' evaluation formula gave greater weight to the less-objective interview component of the process.  *See Keyes v. Sec'y of the Navy,* 853 F.2d 1016,

---

[15] Greene claims a "sense that [Peavey] did not feel comfortable to work with him on a daily basis . . . that [she] had a racial animus towards [him]." Pl.'s Opp'n at 23.  In his deposition, Greene testified that he believed that he was not on Walgreens "list to be promoted" because Peavey had "an attitude" about him.  Greene Dep. at 106.

1026 n. 12 (1st Cir. 1988) ("Evaluating an applicant at an interview is a highly subjective exercise.").  Walgreens contends that the format for the interview, from which the interviewers were not permitted to deviate, effectively eliminated subjective influences on the outcomes.  More to the point, neither Peavey nor Nash (the only managers to whom Greene attributes a subjective animus) were involved in the interview process.  Rather, Greene was interviewed by a panel of managers to whom he did not report.  He was asked the same nine questions as were all other applicants.  His interviewers used the same format in comparing his answers with those of the other candidates.  *See* Def.'s Ex. B, Dkt # 47-3 at 14-38.  In a similar case, where the employer "took pains to standardize the interview process, as well as record and quantify the candidates' performance on a uniform scale," asked precisely the same questions of each candidate, and made "the subjective part of the promotion process as objective as possible," the First Circuit held that, without more, no reasonable inference of pretext could be drawn.  *Hicks v. Johnson*, 755 F.3d 738, 747 (1st Cir. 2014), quoting *Freeman,* 865 F.2d at 1341 ("If the interviewers erred in judging the candidates' relative qualifications, . . . there is nothing to suggest that the error was anything but a permissible 'garden-variety mistake in corporate judgment.'").  The same applies here as well.

Apart from alleged animus on the part of Peavey and Nash, Greene relies on statistical evidence of disparate treatment – namely that the eleven candidates chosen from among the 15 who vied for the AST-M position were all white and nearly all under forty.[16]  However, in disparate treatment cases, statistical evidence carries little probative weight.  *See LeBlanc,* 6 F.3d at 848 ("[A] company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual.").  This is in part because "[i]n a disparate treatment case . . . the issue is less whether a pattern of discrimination existed and more how a particular individual was treated, and why." *Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 156 (1st Cir. 1990). Statistical evidence is relevant where a large sample size yields statistics showing, for example, that the upper ranks of management are closed to a protected class, thus giving rise to an inference of discrimination.  *Cf.*

---

[16] Greene argues that the selection rate for whites exceeded 80%, which "using the EEOC Rule of four-fifths, plaintiff has proven statistical significance of both race and age in this case."  Pl. Opp'n at 18 (Dkt #68). However, the four-fifths rule has long been discredited in cases like this where there is such a small pool of candidates.  *Jones v. City of Boston*, 752 F.3d 38, 51 (1st Cir. 2014), quoting *Fudge v. City of Providence Fire Dep't,* 766 F.2d 650, 658 n.10 (1st Cir. 1985) ("We previously rejected reliance on the four-fifths rule by a plaintiff in a case in which the sample size was small, describing the rule as 'not an accurate test of discriminatory impact.'").

*Lipchitz v. Raytheon Co.,* 434 Mass. 493, 509 (2001). The inference, however, ordinarily requires the support of expert testimony. *See* Fed. R. Civ. P. 403. While Greene offers the hearsay statement of Dr. Elizabeth Newton, a statistician, Dr. Newton was never named as an expert, qualified as one, nor does her statement shed much light on why she thought statistical significance could be drawn from such small numbers.[17]

Even if Greene could show convincing weaknesses in Walgreens' interview process, he is still required to demonstrate that Walgreens' proffered reasons for failing to promote him were not only pretextual, but motivated by unlawful discrimination. While Greene may be correct that Peavey and/or Nash did not like him personally, there is no evidence that his age and race influenced their negative feelings. "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real [and discriminatory] motive." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 824

---

[17] Greene states that "[a]fter Dr. Newton had completed a cursory evaluation of the data, she stated that her first impression, without having completed a detailed analysis, was that the computed disparities are statistically significant." Pl.'s Opp'n at 18. Because the sample size is statistically insignificant, the court sees no purpose to be served in permitting Greene additional time to attempt to further qualify Dr. Newton's opinion.

(1st Cir. 1991).   Despite the alleged lack of support for his candidacy by Peavey and Nash, Greene did apply for the ASM-T position and neither Nash nor Peavey was involved in the testing or interviews that led to the denial of the promotion. *See* Peavey Aff. ¶ 17.   To succeed on a failure-to-promote claim, plaintiff must be able to plausibly trace a discriminatory intent to the person or persons who denied him the promotion.  *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007), quoting *Velázquez-Fernández v. NCE Foods, Inc.*, 476 F.3d 6, 11-12 (1st Cir. 2007) ("Statements made by those who are not involved in the decisional process 'normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.'"). This Greene has failed to do.

### Disparate Impact

"'[D]isparate impact' [claims] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993), quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n.15 (1977). Unlike disparate treatment claims, disparate impact claims do not require proof of a discriminatory motive.  *See Prescott v. Higgins*, 538 F.3d 32, 41 (1st Cir. 2008).

As evidence of disparate impact, Greene again relies on the comparison of the ages and race of the chosen and the rejected candidates.  But he has not pointed to any specific aspect of the mathematics exam, the IRR, the interview process, or the weighting of the three components that led to a disparity because of race or age, an essential requirement in a disparate impact case.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmt'ies Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity.  A robust causality requirement . . . protects defendants from being held liable for racial disparities they did not create.").  Greene simply alleges that Walgreens' "published procedure" and its "three wave promotion process" excluded older and minority candidates, and that "either the math test, or the job interview, or both taken together unfairly impacted members of protected classes."  Dkt # 1 at 27; Pl.'s Opp'n at 31.  However, "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact."  *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 357 (2011) ("[M]erely proving that [a] discretionary system has produced a racial or sexual disparity *is not enough.*").

Even if Greene were able to establish a prima facie case of disparate impact, Walgreens submits convincing evidence that Greene was not promoted because he was among the lowest-performing applicants for the open positions in District 106 (despite his acknowledged mathematical abilities), and because he had one of the weakest interviews.[18]  It also contends (with support in the record), that even if its promotion decisions had a disparate impact on older, non-white candidates, those decisions are "job-related for the position in question," "borne out of business necessity," and based on reasonable factors other than age and race.  *Lopez v. City of Lawrence,* 823 F.3d 102, 110-111 (1st Cir. 2016).

To establish a "business necessity" defense under Title VII's disparate impact provisions, Walgreens must demonstrate that its program "aims to measure a characteristic that constitutes an 'important element[] of work behavior,'" and that the outcomes of the evaluation process are "'predictive of or significantly correlated with' that characteristic."  *Jones v. City of Boston*, 752 F.3d 38, 54 (1st Cir. 2014), quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975).  Walgreens evaluated its candidates on three job-related factors: the candidate's mathematical skills, past job

_____

[18] *See* Def.'s Ex. B, Dkt # 47-3 at 8 (declaration of Christopher Cogdill, the Walgreens district manager who served on Greene's interview panel).

performance, and responses to a series of interview questions specifically targeted to address ASM-T competencies.   According to Walgreens, the competencies measured by the math test were the ability to "calculate[e] gross profits, costs, retail prices, gross-profit percentages or pro-rated ad prices."  Gerjerts Decl. ¶ 7.  The IRR asked a series of questions designed to rate the candidate's job performance related to "Knowledge of Company Policies & Procedures; Ability to Read and Write; Ability to Learn and Work Under Pressure; Valuing the Customer; [and] Being Motivated and Ethical & Honest."  *Id.* ¶ 8.  The interview consisted of questions assessing "how applicants handle certain job-related situations and [their] ability to manage the store and others."  *Id.* ¶ 9.  All three measures had a comprehensive, detailed rating scale; Walgreens selected the best-performing candidates or those best fitted to its business model.

Greene attempts to counter Walgreens' business necessity defense by contending that an alternative test or set of selection criteria might exist that served Walgreens' business interest without the "undesirable racial effect." Pl.'s Opp'n at 35, quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).  But fatal to his claim, he fails to identify the better alternative that

he has in mind.[19]  *See Ricci v. DeStefano*, 557 U.S. 557, 578 (2009); *see also Lopez,* 823 F.3d at 120.

The business judgment rule allows a company to make bad, unwise, or even unfair decisions without judicial interference so long as these decisions are not discriminatory.  "Courts may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions."  *Mesnick*, 950 F.2d at 825; s*ee also Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 352 (1st Cir. 1997) (same).  As a consequence, proof of competing qualifications will seldom create a triable issue of pretext.  *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74-75 (1st Cir. 2004) ("Qualifications are notoriously hard to judge and, in a disparate treatment case, more must be shown than that the employer made an unwise personnel decision by promoting 'X' ahead of 'Y.'"); *cf. Melendez v. Autogermana, Inc.,* 622 F.3d 46, 53 (1st Cir. 2010) ("[D]ecision to adopt a new sales quota is a business decision that we may not question in an employment discrimination case.").

---

[19] Greene argues that "Walgreens must also prove the lack of an acceptable alternative process."  Pl.'s Opp'n at 39.  This is a misstatement of the law; the burden of showing an alternative rests with a plaintiff.  *See Jones*, 752 F.3d at 53, quoting *Albemarle*, 422 U.S. at 425 ("[A] plaintiff can prevail in the face of demonstrated business necessity only by proving a failure to adopt an alternative practice that would satisfy the department's legitimate business needs 'without a similarly undesirable racial effect.'").

ORDER

For the foregoing reasons, Walgreens' motion for summary judgment on all counts is <u>ALLOWED</u>.  The clerk shall enter judgment for Walgreens and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE